## POPULAR DRY GOODS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2141.    Promulgated February 7, 1927.

1. Certain expenditures *held* to be deductible as ordinary and necessary expenses.

2. Deduction of an alleged bad debt denied.

*E. W. Wotipka, C. P. A.*, and *Zack Lamar Cobb, Esq.*, for the petitioner.

*George E. Adams, Esq.*, for the respondent.

This is a proceeding for the redetermination of a deficiency of $7,039.87, income and profits tax for 1919, 1920, and 1921. The deficiencies result from the disallowance of certain deductions taken in each of the years of amounts spent in giving dances for employees; from the disallowance of a deduction of $3,498.22 alleged to

be a bad debt ascertained to have been worthless and charged off in 1921; and from the determination that certain expenditures in 1921 were not for repairs but were for capital items.

FINDINGS OF FACT.

The petitioner is a Texas corporation operating a department store in El Paso.

It was the practice of the petitioner to hold weekly meetings of the department heads, at which they were shown a record of their sales for the corresponding week of the preceding year, and prizes were offered to the floors showing the greatest increase in sales. Sometimes payments were made in cash, but, in order that all the employees should benefit, and as an incentive for their services, some few dances or picnics were given throughout the year for the entire force. As a result of this policy the petitioner spent $155.30 in 1919, $171.50 in 1920, and $115 in 1921 for dances for its employees.

In January of each year the petitioner took an inventory of its merchandise, after which it checked up its accounts. The president went over all the accounts receivable in excess of $50 with the credit man and analyzed them, and the accounts that were past due and unsecured were charged off. The entries were made as of December 31, although the work in connection therewith was not completed until toward the latter part of January. The accounts were then transferred to a loss and gain ledger. Statements on these accounts were sent out every month and other efforts made to collect them. Some of the accounts in this ledger were fifteen years old. The total of such accounts transferred to the loss and gain ledger as of December 31 of each year was deducted from gross income, and subsequent collections thereon were returned as income in the year received. In 1919 the petitioner collected $9,758.78 on these accounts; in 1920, $23,166.47; and in 1921, $12,337.96.

Included in the accounts charged off as bad debts as of December 31, 1921, was one amounting to $3,498.22, standing in the name of Jose Miledi. Miledi was located in Chihuahua, Mexico, and had maintained an open account with the petitioner for many years. The account was wholesale and was handled personally by Schwartz, president of the petitioner. During the summer months of 1921 Miledi became financially embarrassed. The Mexican attorney of the petitioner advised that to sue would throw Miledi into bankruptcy. Schwartz "flagged" the Miledi account with a sticker reading "Careful—This is K. O., Ask before posting." The sticker was initialed "N. M. T. P." and dated "11–24–21." "K. O." meant keep off. Such a sticker was used whenever an account was slow and it indicated not to charge any more until conditions were better.

Schwartz agreed to sell additional goods to Miledi only for cash, which was to be deposited at the time of purchase, and Miledi was to reduce his old balance by payments from his profits. Between November 24 and December 14, Miledi was allowed to make purchases totaling $1,059.65. During the same period he paid $250 cash and received credit for goods returned of $118.50. On December 14 the balance due was $3,882.22. On that date Miledi gave the petitioner a Mexican acceptance for his indebtedness. The note was endorsed by Schwartz and sent to the petitioner's agent in Chihuahua for collection on February 27, 1922. On January 6, 1922, Miledi made a cash payment of $384, reducing the balance to $3,498.22. When the books were finally posted in January, 1922, the Miledi account in the amount of $3,498.22, allowance having been made for the payment on January 6, 1922, was transferred to the loss and gain ledger and was deducted from gross income for 1921. Thereafter this account was credited with cash payments in the following amounts on the stated dates:

| | |
|---|---:|
| January 20, 1922, cash | $96. 00 |
| February 20, 1922, cash | 289. 20 |
| April 11, 1922, cash | 711. 48 |
| April 14, 1922, cash | 385. 42 |
| May 4, 1922, cash | 75. 00 |
| May 15, 1922, cash | 200. 00 |
| June 20, 1922, cash | 614. 45 |
| August 7, 1922, cash | 100. 00 |
| August 21, 1922, cash | 91. 90 |

The petitioner's books show that Miledi was allowed to open a new account on April 11, 1922. The cash payments made by Miledi were credited against the old balance, while his new purchases were allowed to accumulate. The new account between April 11 and October 24, 1922, shows but one credit of cash paid amounting to $108.82. On October 24, 1922, the balance shown by the books to be due on the old account was $1,367.58, which included $240 interest on the notes and an additional purchase of goods entered in this account of $192.81. As of that date this balance was transferred to the new account, making a total balance due of $3,188.71. On October 25, Miledi paid cash in the amount of $955.80.

During 1921 the petitioner expended $19,330.81 for repairs, improvements, betterments and additions. It covered the expenditures made on the four pieces of property owned or under lease by the petitioner during the taxable year 1921. The expenditures were charged to general expense, including the labor and materials. One Glazer, who was in charge of the repairs and alterations, kept memoranda of the expenses and the work done. At the end of the year the expenses were segregated by Glazer and the tax adviser of

the petitioner. This segregation showed capital items of $4,957.44 and repair items of $14,373.37. The Commissioner allowed $6,185.74 as expenditures for repairs and capitalized $13,145.07, thus disallowing as a deduction $8,187.63, which he distributed as follows:

| | |
|---|---|
| Main building | $787.36 |
| Hammett Building | 2,275.00 |
| Annex | 3,979.27 |
| Fixtures | 796.00 |
| New carpets | 350.00 |

The main building was a six-story brick building with basement, owned by A. Schwartz, president of the petitioner, and leased by it at least since 1914, which lease was renewed July 1, 1921, for fifteen years. The Commissioner segregated the $787.36 disallowed by him for work done in this building, as follows: alterations, $580; pent house, $63.48; radiators, $143.88. The Commissioner allowed as a deduction one-half of the cost of the work on the pent house, which consisted of reinforcing by new beams and posts a beam which had been cracked by the jars of the elevator. Other work done in this building was the repairing of the terra cotta on the fifth floor. In the basement a seepage developed which necessitated reinforcing the walls and floor to keep out the water. Walls and ceilings along the stairways were scratched and defaced by moving fixtures up and down. Some of the plaster fell off the ceiling. In all such cases the plaster had to be replaced and repainted. The floors had to be repaired and also the water pipes and steam pipes.

On January 1, 1921, the petitioner renewed its lease, for an additional term of fourteen years, on the second floor of the property designated by the Commissioner as the Hammett Building. During 1921 the petitioner expended $3,030 on this property, the total amount of which was deducted as an expense, and $2,275 of which the Commissioner disallowed. The expenditure on this building was for patching the floors and the plaster, painting, fixing a leak in the roof, and repairing the stairway.

The term "annex," as used by the Commissioner, applied to two properties adjoining the main building; one the Bassett property, a three-story brick structure, was purchased on February 16, 1920; the other, a two-story brick building purchased from Mrs. Hammett on November 29, 1920. The Bassett and Hammett purchases had to be altered and remodeled in order to facilitate the transaction of petitioner's business. The window fronts of these two properties were remodeled to correspond with the window fronts of the main building at a cost of $4,957.44, which amount is in addition to the $3,972.27 expended on these properties and disallowed by the Commissioner. These two properties were situated side by

side and the interiors of the ground and second floors were thrown together into one large room on each floor by tearing out the partitions and substituting supporting beams and timbers. Plastering, papering, painting and removal of plumbing fixtures and other changes were made to transform the buildings into an operating unit. The Bassett property had a hotel on the second and third floors. The numerous partitions and the plumbing in this building had to be torn out and removed. Connecting doorways were cut through the walls to the main building.

The Commissioner disallowed the deductions for employees' dances as well as the deductions for the account of Jose Miledi.

OPINION.

MORRIS: The first issue raised is whether the amounts spent by the petitioner in 1919, 1920, and 1921 for dances for employees are ordinary and necessary business expenditures. The petitioner contends that the amounts constituted a bonus to the employees and are therefore deductible. It is unnecessary to determine whether or not these amounts constituted a bonus. It is sufficient that the expenditures were an ordinary and necessary business expense. The evidence convinces us that these amounts were expended because of a direct business benefit to the petitioner. The offer was made by the corporation to the employees that in consideration of an increase in sales volume the petitioner would do certain things. Employees' dances were one of the inducements held out to the employees to increase the sales total. Under the circumstances, we are of the opinion that the amounts expended for these dances during the taxable year in question are deductible.

The second issue relates to the Miledi account. The account was charged off as a bad debt by the petitioner in line with a consistent business practice for years of not carrying doubtful accounts as assets. The Commissioner disallowed its deduction for the reason that there was no ascertainment of worthlessness. The findings of fact amply set forth the situation with regard to this account. The president of the petitioner testified that he determined the account to be worthless when he " flagged " it with a sticker, but he further testified that these stickers were used whenever an account was slow and they indicated not to charge any more until conditions were better. There is considerable difference between a slow account and one that is ascertained to be worthless. We do not doubt that the Miledi account was thought to be doubtful, but the facts in connection therewith indicate to our minds that there was not an ascertainment of worthlessness. The petitioner held Mexican acceptances for the amount of the debt which were given shortly before

the close of the year 1921. A collection was made within six days after the close of that year, a fact which the petitioner recognized by deducting as of December 31, 1921, the balance of the account after the payment on January 6, 1922. Between January 20, 1922, and August 21, 1922, inclusive, Miledi paid $2,563.45, which was applied to the account. He was allowed to open a new account in April, to which, on October 24, 1922, the balance of the old account was added, thus restoring it to an active status. In view of these facts, the deduction of $3,498.22 claimed by the petitioner for 1921 is disallowed.

In regard to the expenditures made by the petitioner on the properties owned and leased by it, we have previously distinguished between expenditures which are deductible as ordinary and necessary expenses and those which should be capitalized, in the *Appeal of Illinois Merchants Trust Co.*, 4 B. T. A. 103, 106, in which we said:

In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment, which should not be applied against current earnings. * * * *Appeal of Simmons & Hammond Manufacturing Co.*, 1 B. T. A. 803.

Applying this reasoning to the instant facts, we are satisfied that the $787.36 which was spent in the main building and disallowed by the Commissioner is properly deductible, and that $2,275 of the $3,030 expended on the Hammett property and disallowed by the Commissioner was an ordinary and necessary expense and deductible as such.

The expenditures on the annex, or Hammett and Bassett properties, were principally for the conversion of those properties into an operating unit. They were not for repairs but for alterations which made the properties adaptable to a different use. Expenditures for such alterations, although they do not increase the value of the property, are not deductible from gross income. We have no evidence on the items disallowed by the Commissioner under fixtures and new carpets, and therefore approve his determination in that respect.

*Judgment will be entered on 15 days' notice, under Rule 50.*